UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THOMAS WENDORF,

        Plaintiff,

                                             Case No. 08-CV-12229
vs.                                    HON. GEORGE CARAM STEEH

JLG INDUSTRIES, INC.,

        Defendants.

_____/

ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (# 45),
DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT (# 47),
AND GRANTING PLAINTIFF'S MOTION TO AMEND CIVIL COMPLAINT (# 56)

      Defendant JLG Industries, Inc. moves for summary judgment of plaintiff Thomas

Wendorf's product liability claims.  Wendorf moves for partial summary judgment as to his

product liability claims premised on theories of breach of implied warranty of fitness,

negligent design and testing, and failure to warn.  Wendorf also moves for leave to file an

amended claim of gross negligence under M.C.L. § 600.2946a(3).  A hearing was held on

the motions on August 24, 2009.  For the reasons set forth below, JLG's motion for

summary judgment will be DENIED,  Wendorf's motion for partial summary judgment will

be DENIED, and Wendorf's motion for leave to file an amended claim of gross negligence

will be GRANTED.

## I. Background

      Wendorf filed a complaint in state court on February 6, 2008 alleging that he was

employed as a Field Mechanic by non-party Hertz Equipment Rental Corporation on

October 10, 2006, operating a 2030 ES Model mobile scissor lift manufactured and designed by JLG.  JLG allegedly sold the mobile lift to Hertz.  Wendorf alleges that the mobile lift was capable of being operated by a joystick handle while the operator stood on the ground away from the machine.  Wendorf alleges that, as he was walking beside the machine, he positioned the joystick for a right turn, but the lift did not respond and continued to turn left, striking him in the right ankle and causing serious injuries.  Wendorf alleges product defect and negligence under theories of: (1) not fit for its intended purpose; (2) breach of an express or implied warranty that the vehicle was fit for its intended purpose; (3) defective design or manufacture; (4) failure to timely warn or advise of defects when JLG knew or should have known of the defects; (5) negligence in pre-sale testing and preparation; (6) lack of proper safety devices, including a shut-off switch; and (7) other negligence. The action was removed to federal court on May 21, 2008 based on diversity of citizenship.  28 U.S.C. § 1332.

The 2030 ES Model mobile scissor lift at issue is equipped with a cable that allows the operator to walk beside the machine and control its movement.  The machine has five to six feet of slack cable running from the machine to a controller joystick equipped with a rocker-type toggle switch having two directions, left and right.  The lift turns in the direction that the switch is pressed, and continues turning, up to 90 degrees, until the switch is released and returns by spring action to the neutral position.  The machine is approximately six feet long, and has a maximum speed of four feet per second.

Wendorf testified on December 2, 2008, that he was driving the scissor lift from a washing bay to a shop bay, walking on the ground to the immediate left of the lift, and positioned about 3.5 to four feet away from the machine at the midpoint of the vehicle.

Wendorf testified that he noticed the machine was getting closer to him as he walked, so "I hit the right steer." Dep., at 187-188. Wendorf testified that when he hit the right steer toggle, the machine turned "all the way to the left, and it hit me." Dep., at 188. Wendorf testified that he operated the toggle switch with his thumb, and denied that his thumb was on the left steer switch before he moved it to the right steer switch. Dep., at 108. Wendorf testified that, before he depressed the right steer switch, his thumb had not contacted the steer switch at all for about thirty seconds. Dep., at 106.

In his February 6, 2008 complaint, Wendorf alleges that he "was moving the lift unit forward by use of the joystick turning it to the left," and that he "did then position the joystick so the vehicle would go to the right but the vehicle did not respond and continued to turn to the left and turned into him, hitting his right leg and ankle." Complaint, ¶¶ 6-7, at 2. In a January 8, 2009 affidavit, Wendorf attests that he "turned the vehicle to the left then turned the vehicle to the right," and that the allegations in his complaint are a "true and accurate reflection of my memory of the accident." Affidavit, ¶¶ 2-3, at 1-2.

The alleged product defect is the computer software associated with the rocker-type toggle switch, and the machine's alleged action of continuing to turn left if the right steer toggle is depressed just after triggering the left steer toggle. The toggle switch sends an electrical signal to a computer located on the scissor lift, which then processes the signal to a left or right solenoid which activates and turns the scissor lift's front wheels either left or right.

The scissor lift operated by Wendorf was manufactured by JLG in May 2004, and was shipped to Hertz on May 25, 2004 with a 12-month express warranty. Wendorf proffers evidence that JLG became aware of the computer software problem in October

3

2004 – if the toggle switch was flipped rapidly from left to right, the on-board computer would recognize a command to turn the vehicle further left until the toggle switch was released from the right side.  Wendorf proffers evidence that JLG instructed its software provider Phoenix International Company to make a timing change to correct the problem in October 2004, within Hertz's 12-month warranty period, and that Phoenix updated all of the computers in its possession with a new 1.5 version software on November 4, 2004, at a cost of $952.00.  Wendorf's scissor lift was equipped with software version 1.3.  Wendorf proffers evidence that all ES Model mobile scissor lifts built by JLG after November 4, 2004 were updated with the newer software versions which corrected the turning problem.  Wendorf argues that JLG did not notify Hertz of the software problem, nor provide Hertz with a software update kit.  Wendorf proffers further evidence that JLG Safety Engineer Brent Hoover and JLG North American Service Manager James Minteer were unaware of the steering problem or the 2004 software update, and instead recommended to Hertz after Wendorf was injured that Hertz change a "steer valve."  According to a document created by one Bill Foss, the subject scissor lift was tested and software version 1.11 was installed on the machine on November 15, 2006, resolving the turning issue.  Plaintiff's Ex. 21.

Wendorf also testified during his deposition that he had read all of the pertinent manuals and warning placards associated with the scissor lift, opined that he was an "expert" on the machine as a field mechanic, and stated that he never received the training given to Hertz mobile scissor lift operators.  JLG has proffered an Operators & Safety Manual for the 2030 ES Model mobile scissor lift which reads in part:

> • Never slam a control switch or lever through neutral to an opposite direction.  Always return switch to neutral and stop before moving the switch to the next function.  Operate controls with slow and even pressure.

*       *       *

&bull; Keep non-operating personnel at least 6 ft. (1.8m) away from machine during all driving operations.

Defendant's Exhibit C.  An AEM Aerial Platform Safety Manual reads:

– Never jam an operating control from one travel direction to the other. Return to neutral stop, then proceed in the other direction.

– Avoid sudden stops, starts, turns or changes in direction.

Defendant's Exhibit D.  Wendorf admitted that he knew of these instructions to "never slam a control switch or lever through neutral to an opposite direction," and "to always return the switch to neutral and stop before moving the switch to the next function."  Dep, at 140.

JLG Expert Charles Ricard opines in his March 29, 2009 report that there were four causative factors related to Wendorf's accident: (1) standing in front of the tire in the direction of travel; (2) standing too close to the unit; (3) driving at an excessive speed; and (4) not being attentive.  Ricard opines that if Wendorf "inadvertently moved the steering controller to the left," operator error was the cause of the injury.  Ricard further opines that, if Wendorf was steering the unit to the left, and then "slammed the controller to the right," then this "misuse" was the cause of his injury.  Ricard also offers his opinion that Wendorf's employer Hertz contributed to the accident by failing to properly train and supervise Wendorf, and by failing to modify procedures after being notified of a previous accident. Defendant's Exhibit S.

## II. Parties' Arguments for Summary Judgment

JLG argues it is entitled to summary judgment because Wendorf testified at his December 2, 2008 deposition that thirty seconds passed before he pressed the steering toggle to the right, undermining Wendorf's Expert Daniel Pacheco's opinion that the

5

proximate cause of Wendorf's injuries was the software product defect that caused the machine to turn left upon an "immediate change from left steer input to right steer input." JLG asserts that Wendorf has not pleaded a product liability claim based on the unit turning left when the toggle switch is pressed to the right after a 30-second delay.  JLG argues that the court should not consider Wendorf's later January 8, 2009 affidavit, attesting that he "turned the vehicle to the left then turned the vehicle to the right," which contradicts his deposition testimony of a thirty second delay.  JLG argues that, even if the court considers Wendorf's later affidavit attesting to a more rapid transition from the left toggle position to the right toggle position, Wendorf's acts of "slamming" the switch and operating the vehicle without training constitutes unforeseeable "misuse" of the switch, precluding liability by operation of M.C.L. § 600.2947(2) and M.C.L. § 600.2945(e).  JLG asserts Wendorf also voluntarily assumed an "unreasonable risk of personal injury," admitting that he knew there was a risk of being run-over if he operated the unit from the ground, and having been warned that personnel were to be kept away from the moving machine, thus precluding liability by operation of M.C.L. §§ 600.2947(3).  JLG continues that the "aspect of the unit that allegedly caused the harm," the turning mechanism, complied with all standards set forth in federal or state statutes and regulations when the unit was sold and delivered to Hertz in May 2004, further precluding liability under M.C.L. § 600.2946(4).  JLG relies on expert Ricard's opinion that "[t]he design of The Unit is in compliance will all applicable Industry Standards and Regulations."  JLG maintains that Wendorf has not come forward with evidence that the steering unit was "not reasonably safe at the time the specific unit of the product left the control of" JLG, "a practical and technically feasible alternative," or a "causal connection" between an existing defect and his alleged injury, precluding liability

6

2:08-cv-12229-GCS-RSW   Doc # 92   Filed 01/11/10   Pg 7 of 21   Pg ID 3668

by operation of M.C.L. § 600.2946(2).  JLG relies on expert Ricard's opinions that the unit was reasonably safe when it left JLG, and that Wendorf's misuse of the unit and lack of operator training were the proximate cause of his injuries.  JLG maintains that Wendorf's failure to warn claims involve "a  material risk that is or should be obvious [or] a matter of common knowledge," thereby precluding liability under M.C.L. § 600.2948(2) because Wendorf assumed the risk of operating the machine from the ground, Wendorf stood too close to the machine, Wendorf was warned not to "slam" the toggle switch from left to right, Wendorf cannot show that he would have used the machine differently had he been warned, JLG Expert Ricard opined that Wendorf would not have been injured had he complied with all warnings, and Wendorf was a "sophisticated user" for purposes of  M.C.L. § 600.2947(4).

In moving for partial summary judgment, Wendorf counters that JLG knew as of October 2004 that the steering feature was defective, and had a software fix for the problem as early as November 4, 2004.  Wendorf asserts JLG is liable for failing to take any action to advise Hertz of the software defect prior to his October 10, 2006 accident. Wendorf argues he is entitled to partial summary judgment under theories of breach of implied warranty of fitness, negligent design and testing, and failure to warn, as well as an amended claim of gross negligence under M.C.L. 600.2946(A)(3), for which he now seeks leave to plead.

### III. Standard of Review

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any

material fact and that the moving party is entitled to judgment as a matter of law." See Redding v. St. Eward, 241 F.3d 530, 532 (6th Cir. 2001). The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Amway Distributors Benefits Ass'n v. Northfield Ins. Co., 323 F.3d 386, 390 (6th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in a light most favorable to the non-moving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Redding, 241 F.3d at 532. If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 270 (1968); see also McLean v. 988011 Ontario, Ltd., 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. Anderson, 477 U.S. at 248, 252. Rather, there must be evidence on which a jury could reasonably find for the non-movant. McLean, 224 F.3d at 800 (citing Anderson, 477 U.S. at 252).

### IV. Wendorf's Deposition Testimony

Wendorf alleges in his February 6, 2008 complaint:

6. [P]laintiff, THOMAS WENDORF, while standing to the left of the scissors lift was moving the lift forward by use of the joystick turning it to the left.

8

7. [P]laintiff, THOMAS WENDORF, did then position the joystick so the vehicle would go to the right but the vehicle did not respond and continued to turn to the left and turned into him, hitting his right leg and ankle.

Complaint, at 2.

Wendorf testified at his December 2, 2008 deposition:

Q  How long a period of time had passed since the last time you had steered it to the left?

A  [by Wendorf]  About twelve feet.

Q  So your thumb was not on the left steer switch immediately before it went to the right steer, is that correct?

A  Yes, sir.

Q  For purposes of my understanding the time instead of the distance, I asked you time, can you estimate for me approximately how long it had been before you depressed the right steer function, how long had it been since the last time you touched the steer switch in any way?

A  I'm going to say a half a minute.

Q  Thirty seconds?

A  Yes, about that.

Wendorf Tr., at 107-08.  Wendorf also testified:

Q  Okay.  And at that point in time that you realized that the machine was coming near you, did you move away from it?

A  [by Wendorf]  No.  I hit the right steer.

Q  Okay.

A  To move the machine away from me.

Q  At that point, what occurred?

A  It went to the left, all the way to the left, and it hit me.

Q  Okay.  At the point in time that you hit the right steer, how far away was

9

the closest part of your body to the machine?

A  I'm going to say it had to be at least three and a half feet, four.

Id. at 188.

Wendorf attests in his January 8, 2008 affidavit:

2.  [T]he Civil Complaint indicates that I had turned the ES Scissor vehicle to the left and then turned the vehicle to the right, but the vehicle did not turn to the right but continued to turn further to the left running over my foot.

3. [T]he statements in the Complaint as to what directions I had steered the vehicle leading up to it running over me, are a true and accurate reflection of my memory of the accident at the time of my review of the Complaint in January 2008 and prior to that.

4. [M]y memory of the accident would have been fresher and clearer in January of 2008 than in December of 2008 when my deposition was taken.

If a plaintiff's deposition testimony contradicts the allegations in his complaint, the court should credit the later testimony in ruling on a motion for summary judgment.  Leary v. Livingston County, 528 F.3d 438, 444 (6th Cir. 2008).  In deciding in its discretion whether to consider a post-deposition affidavit on summary judgment, a district court "must first consider whether the affidavit directly contradicts the nonmoving party's prior sworn testimony."  Aerel, S.R.L. v. PCC Airfoils, L.L.C., 448 F.3d 899, 908 (6th Cir. 2006).  "A directly contradictory affidavit should be stricken unless the party opposing summary judgment provides a persuasive justification for the contradiction."  Id.  "If, on the other hand, there is no direct contradiction, then the district court should not strike or disregard that affidavit unless the court determines that the affidavit 'constitutes an attempt to create a sham fact issue.'"  Id. (quoting Franks v. Nimmo, 796 F.2d 1230, 1237 (10th Cir. 1986)).

Wendorf's complaint and post-deposition attestations do not directly contradict his deposition testimony.  The complaint and affidavit do not allege estimates of the time

10

elapsed or distance traveled between Wendorf's act of turning the scissor lift left, "then" turning the scissor lift right.  The deposition testimony itself appears contradictory. Wendorf's testimony that he traveled "about twelve feet" in "a half a minute" would place the speed of the lift at .4 feet per second, a relatively slow pace.  At .4 feet per second, and in conjunction with Wendorf's additional testimony that he was standing four feet away from the machine when it "went all the way to the left, and it hit me," the elapsed time would have been 10 seconds.  Such a time frame is inconsistent with Wendorf's testimony that he "hit the right steer . . . [t]o move the machine away from me," and at that point, "[i]t went to the left, all the way to the left, and it hit me."  The court is not persuaded that Wendorf's affidavit was proffered to create a "sham" issue of fact.  Aerel, S.R.L., 448 F.3d at 908. Construed in a light most favorable to Wendorf, Wendorf's deposition testimony does not establish beyond all reasonable dispute the time that elapsed from the moment he turned the scissor lift to the left, then used the toggle switch in an attempt to turn the scissor lift to the right.  Amway Distributors, 323 F.3d at 390; Matsushita Elec., 475 U.S. at 587; Redding, 241 F.3d at 532.

### V. Expert Pacheco's Opinion of Software Defect

The court has ruled in a separate order of even date that Wendorf's Expert Daniel Pacheco is precluded from testifying as to the alleged computer software defect, including his opinion that the alleged defect caused the lift to turn left upon an "immediate change from left steer input to right steer input."  However, Wendorf has proffered evidence that JLG knew of a software defect in October 2004 that in fact caused JLG lifts such as the subject 2030 ES Model to turn left instead of right "during rapid Left to Right transitions." See Plaintiff's June 1, 2009 Exhibit 5.  Wendorf has proffered further evidence that

11

reprogramming the software in November 2004 cured the defect.  Id.

Federal Rule of Evidence 407 provides:

When, after an injury or harm allegedly caused by an event, measures are taken that, if taken previously, would have made the injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove negligence, culpable conduct, a defect in a product, a defect in a product's design, or a need for a warning or instruction.  This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasability of precautionary measures, if controverted, or impeachment.

Fed. R. Evid. 407.  By its express wording, Rule 407 does not bar evidence of measures taken after the design or manufacture of a product, but before the injury allegedly caused by the event.  In re Air Crash Disaster, 86 F.3d 498, 531 (6th Cir. 1996).  Wendorf's proffered evidence of the discovery and cure of the alleged software defect roughly two years before his October 10, 2006 injury is not barred by Rule 407.

Further, Rule 407 expressly does not bar evidence of subsequent remedial measures offered for purposes of impeachment.  Id. (finding plaintiff was entitled to impeach defense testimony that the allegedly defective device was "state of the art" and "not defective" with post-accident evidence of modifications made to the device to correct deficiencies).  JLG has consistently maintained that the steering device's computer software was not defective.  Wendorf has proffered evidence that, on November 15, 2006, Service Technician Bill Foss updated the subject lift's software to correct the problem that the "[m]achine keeps steering left after pressing right steer button," and "tested unit and now working fine."  Plaintiff's June 1, 2009 Exhibit 5.  In short, Wendorf has proffered sufficient evidence independent of Pacheco's opinion, including Wendorf's own deposition testimony, to create questions of fact as to whether the steering software was defective,

12

and whether the defect was a proximate cause of his injuries. <u>Amway Distributors</u>, 323 F.3d at 390; <u>Matsushita Elec.</u>, 475 U.S. at 587; <u>Redding</u>, 241 F.3d at 532.

## VI. JLG's Statutory Defenses

Wendorf has proffered evidence allowing a  reasonable jury to find that: the mobile scissor lift he was operating on October 10, 2006 was defective because it's software would direct the machine to turn left if the toggle switch was quickly activated from a left turn to a right turn; that he in fact depressed the toggle switch in a manner that activated the software and caused the scissor lift to turn left instead of right; that the alleged software defect existed when the machine left JLG's control on May 25, 2004; that the defect rendered the machine not reasonably safe; that the software defect in fact caused his injuries; and that a "practical and technically feasible" computer software fix was available to JLG on or before May 25, 2004.  M.C.L. § 600.2946(2).  "An alternative production practice is practical and feasible only if the technical, medical, or scientific knowledge relating to the production of the product, at the time the specific unit of the product left the control of the manufacturer or seller, was developed, available, and capable of use in the production of the product[.]"  <u>Id</u>.  Wendorf has proffered evidence that the subject scissor lift was equipped with the allegedly defective software, version 1.3, when it left JLG's control on May 25, 2004.  It remains possible for Wendorf to show that, at JLG's request, software provider Phoenix International Company had the technical programming ability prior to May 25, 2004 to modify the version 1.3 timing commands.  On this record, the jury is free to reject JLG Expert Ricard's opinions, which in essence track the wording of M.C.L. § 600.2946(2) and other Michigan statutes.  <u>See</u> <u>Powers v. Bayliner Marine Corp.</u>, 83 F.3d 789, 797-98 (6th Cir. 1996) (recognizing that a jury may properly reject an expert witness's

opinion "even if uncontradicted.").

Likewise, it remains possible for Wendorf to demonstrate as a matter of law that his activation of the toggle switch did not constitute "misuse" because it was not contrary "to [the] warnings" he admittedly read in the Operators & Safety Manual and AEM Aerial Platform Safety Manual ("[n]ever slam a control switch or lever through neutral to an opposite direction"; "[a]lways return switch to neutral and stop moving the switch to the next function"; "[k]eep non-operating personnel at least 6 ft. (1.8m) away from machine during all driving operations"; "[n]ever jam an operating control from one travel direction to the other"; and '[a]void sudden stops, starts, turns, or changes in direction"), nor an operation of the scissor lift "contrary to . . . instruction provided by the manufacturer, seller, or another person possessing knowledge or training regarding the use or maintenance of the product[.]" M.C.L. § 600.2945(e). A question of fact remains whether Wendorf "slammed" or "jammed" the switch, "stopped" between moving the toggle from left to right, or made a "sudden" turn. The warning to "[k]eep non-operating personnel at least 6 ft. (1.8m) away" is irrelevant; Wendorf was operating the scissor lift. Given Wendorf's unchallenged expertise as a field mechanic relative to the scissor lift and other similar machines, Hertz's failure to provide Wendorf with formal operator training is not dispositive. Consistent with the court's order of even date permitting Wendorf's Expert Pacheco to testify about the general operation of the scissor lift, the warnings may be found not to apply to the steering toggle switch. Neither Pacheco's nor Ricard's opinions on these issues are binding on the court or the jury. See Powers, 83 F.3d at 797-98. More importantly, even accepting for the sake of argument only that Wendorf "misused" the toggle switch as defined in M.C.L. § 600.2945(e), it remains possible for Wendorf to develop a record at trial establishing that

14

any such "misuse was reasonably foreseeable."  M.C.L. § 600.2947(2).

Based on the record before the court, JLG's argument that it is beyond dispute that Wendorf assumed an "unreasonable risk of personal injury" in that Wendorf admitted he knew there was a risk of being run-over if he operated the unit from the ground, and that he had been warned to keep non-operator personnel away from the moving machine, is not well taken.  It is clear from the record that the scissor lift was specifically designed to be driven by an operator standing on the ground.  Wendorf was not a "non-operator." Liability is not precluded by operation of M.C.L. §§ 600.2947(3).

JLG Expert Ricard's opinion that "[t]he design of The Unit is in compliance will all applicable Industry Standards and Regulations" does not preclude JLG's liability by operation of M.C.L. § 600.2946(4).  Ricard does not specify a federal or state statute, or a federal or state regulation, addressing safety standards for toggle switch steering mechanisms.  Id.  Ricard's opinion need not be accepted as true.  See Powers, 83 F.3d at 797-98.  Moreover, even if true, Ricard's opinion would merely create a rebuttable presumption of non-liability.  M.C.L. § 600.2946(4).  Wendorf has come forward with evidence that could rebut such a presumption.


Questions of fact likewise remain as to Wendorf's failure to warn claim.  Wendorf has come forward with evidence which would allow a reasonable jury to conclude that: (1) JLG had actual or constructive knowledge of the alleged dangers associated with the intended use or reasonably foreseeable misuse of the scissor lift's toggle switch turning mechanism; (2) there was no reason to believe that Hertz or Wendorf would know of the dangers; and (3) JLG failed to exercise reasonable care to inform Hertz or Wendorf of the dangers.

Hammons v. Icon Health and Fitness, 616 F. Supp.2d 674, 682 (E.D. Mich. 2009) (citing Portelli v. I.R. Constr. Prods. Co., 218 Mich. App. 591, 598-99, 554 N.W.2d 591, 596 (1996), and quoting Hollister v. Dayton Hudson Corp., 201 F.3d 731, 741 (6th Cir. 2000)). A manufacturer owes a post-sale duty to warn of a dangerous latent defects it learns of shortly after the sale of its product.  Gregory v. Cincinnati Inc., 450 Mich. 1, 11, 538 N.W.2d 325 (1995); Comstock v. General Motors Corp., 358 Mich. 163, 177, 78, 99 N.W.2d 627 (1959).  Wendorf has proffered evidence that JLG knew of the alleged software defect in October 2004, five months after Hertz took delivery of the scissor lift on May 25, 2004, and failed to inform Hertz or Wendorf of the defect prior to Wendorf's October 10, 2006 injury.


JLG's argument that M.C.L. § 600.2948(2) precludes liability under a failure to warn theory because it is beyond reasonable dispute that the warning involved "a  material risk that is or should be obvious [or] a matter of common knowledge" is not well taken.  The warning sought by Wendorf is that the scissor lift would turn further left if the toggle switch was quickly transitioned to make a right turn.  Reasonable jurors could conclude that Wendorf did not assume such a risk by simply operating the machine from the ground or standing close to the machine.  Consistent with the court's analysis of JLG's defense of "misuse" under M.C.L. § 600.2945(e), a question of fact remains whether the written warnings made it obvious or a matter of common knowledge that the scissor lift would make a left turn if the toggle switch was quickly switched from its left position to its right position.  JLG Expert Ricard's opinions to the contrary do not warrant summary judgment. Powers, 83 F.3d at 797-98.

JLG's argument that M.C.L. § 600.2947(4) precludes liability as a matter of law

16

because Wendorf was a "sophisticated user" is not persuasive.  To prevail under a sophisticated user defense, the defendant seller must show that the user had full knowledge of the defect, and that the user should be expected to know of the defect's dangerous characteristics.  Walker v . Eagle Press & Equipment Co., 408 F.Supp.2d 402, 408 (E.D. Mich. 2005).  The sophisticated user doctrine is inapplicable where the alleged defect is an unexpected defect.  Id.  Notwithstanding Wendorf's expertise as a mechanic, reasonable jurors could conclude that Wendorf could not have expected that the scissor lift would turn left into him when the toggle switch was activated to make a right turn.

JLG is not entitled to summary judgment in that a myriad of factual issues remain to be resolved by the jury at trial.  Amway Distributors, 323 F.3d at 390; Matsushita Elec., 475 U.S. at 587; Redding, 241 F.3d at 532.  JLG's motion for summary judgment will be denied.

### VII.  Wendorf's Motion for Partial Summary Judgment

Wendorf argues he is entitled to partial summary judgment under theories of breach of implied warranty of fitness, negligent design and testing, failure to warn, and "gross negligence," arguing it is undisputed that the 2030 ES Model scissor lift he was operating had the alleged software defect, this steering defect in 2030 ES Model mobile scissor lifts was discovered by JLG in October 2004, 2030 ES Model lifts built after November 4, 2004 were equipped with updated software which corrected the defect, JLG did not notify Hertz of the defect or its cure and, after his October 10, 2006 accident, the steering defect in his machine was readily cured by JLG with the installation of the software update.

In addition to the many questions of fact that remain to be resolved by the trier of fact, as previously set forth herein, questions of fact remain as to the cause in fact and

17

proximate cause of Wendorf's injuries. To prevail on a product liability claim, the plaintiff must prove a causal connection between an established defect and injury. Skinner v. Square D Co., 445 Mich. 153, 159, 516 N.W.2d 475 (1994). The plaintiff must prove both cause-in-fact and legal or "proximate cause." Id. at 173. The mere happening of an unwitnessed event is insufficient to establish causation as no presumption arises from the mere fact of an accident. Id. at 163-64 (quoting Howe v. Michigan C.R. Co., 236 Mich. 577, 583-84, 211 N.W. 111 (1926)). "To be adequate, a plaintiff's circumstantial proof must facilitate reasonable inferences of causation, not mere speculation." Skinner, 445 Mich. at 164. If the evidence is without selective application to one or more plausible explanations for how an event happened, the explanations constitute only conjecture. Id. (quoting Kaminski v. Grand Trunk W.R. Co., 347 Mich. 417, 422, 79 N.W.2d 899 (1956)).

Wendorf's proffered deposition testimony and affidavits do not establish beyond dispute that Wendorf triggered the steering toggle switch in a manner that activated the alleged defective software. Construing the testimony and affidavits in a light most favorable to JLG, 30 seconds passed from the time the toggle switch was in the neutral position until Wendorf toggled the switch to the right for a right turn. Expert opinions as to what Wendorf actually did on October 10, 2006 are not dispositive; Wendorf was the only witness to the events. Powers, 83 F.3d at 797-98; Skinner, 445 Mich. at 163-64. Wendorf is not entitled to partial summary judgment as questions of fact remain regarding the cause-in-fact and proximate cause of his injuries. Amway Distributors, 323 F.3d at 390; Matsushita Elec., 475 U.S. at 587; Redding, 241 F.3d at 532.

### VIII.  Wendorf's Motion For Leave to Amend

Wendorf moves for leave to amend his complaint to add a claim of gross negligence

18

under M.C.L. § 600.2946a(3).

> (1) In an action for product liability, the total amount of damages for noneconomic loss shall not exceed $280,000.00, unless the defect in the product caused either the person's death or permanent loss of a vital bodily function, in which case the total amount of damages for noneconomic loss shall not exceed $500,000.00. On the effective date of the amendatory act that added this section, the state treasurer shall adjust the limitations set forth in this subsection so that the limitations are equal to the limitations provided in section 1483. After that date, the state treasurer shall adjust the limitations set forth in this subsection at the end of each calendar year so that they continue to be equal to the limitations provided in section 1483.

> (2) In awarding damages in a product liability action, the trier of fact shall itemize damages into economic and noneconomic losses. Neither the court nor counsel for a party shall inform the jury of the limitations under subsection (1). The court shall adjust an award of noneconomic loss to conform to the limitations under subsection (1).

> (3) <u>The limitation on damages under subsection (1)</u> for death or permanent loss of a vital bodily function <u>does not apply to a defendant if the trier of fact determines by a perponderance of the evidence that the death or loss was the result of the defendant's gross negligence</u>, or if the court finds that the matters stated in section 2949a are true.

> *       *       *

M.C.L. § 600.2946a(1-3) (emphasis added) (footnotes omitted). "'Gross negligence' means conduct so reckless as to demonstrate a substantial lack of concern for whether injury results." M.C.L. § 600.2945(d).

Leave to amend a complaint is to be freely granted when justice so requires. <u>See</u> Fed. R. Civ. P. 15(a). Delay alone is insufficient to deny a motion to amend. <u>Wade v. Knoxville Utilities Bd.</u>, 259 F.3d 452, 458-59 (6th Cir. 2001) (quoting <u>Head v. Jellico Hous. Auht.</u>, 870 F.2d 1117, 1123 (6th Cir. 1989)). Absent bad faith or dilatory motive on the part of the movant, or undue prejudice to the opposing party by virtue of allowance of the amendment, leave to amend should be granted. <u>Foman v. Davis</u>, 371 U.S. 178, 182

(1962); <u>Sinay v. Lamson & Sessions Co.</u>, 948 F.2d 1037, 1041-42 (6th Cir. 1991); <u>Head</u>, 870 F.2d at 1124.

JLG was placed on notice with the filing of Wendorf's February 6, 2008 complaint that this was "an action for product liability" in which Wendorf was seeking damages for pain, suffering, inconvenience, and loss of enjoyment of life, to wit, "noneconomic losses." M.C.L. § 600.2946a(1).  The statute itself put JLG on notice that Wendorf's noneconomic damages cap would be $500,000.00 unless Wendorf proved at trial that the losses were due to JLG's "substantial lack of concern for whether injury result[ed]" from JLG's failure to notify Hertz of a known latent software defect two years before Wendorf was injured. M.C.L. § 600.2945(d).  Wendorf has pursued his product liability claims consistent with an express allegation that JLG lacked a substantial lack of concern in its actions.  The court is not persuaded that JLG will be unduly prejudiced by allowance of the amendment.  This is not a situation where Wendorf is seeking to allege a new legal theory of recovery.  The court is also not persuaded that Wendorf's delay in formally adding a "gross negligence" claim is a product of bad faith or dilatory motive.  The court will grant Wendorf's motion for leave to file an amended claim that his noneconomic damages are not capped by operation of M.C.L. § 600.2946a(3) because his injuries resulted from JLG's gross negligence.

### IX. Conclusion

Defendant JLG's motion for summary judgment is hereby DENIED.  Plaintiff Wendorf's motion for partial summary judgment is hereby DENIED.  Wendorf's motion for leave to file an amended claim of gross negligence under M.C.L. § 600.2946a(3) is hereby GRANTED.

SO ORDERED.

20

Dated:  January 11, 2010


s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE


CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
January 11, 2010, by electronic and/or ordinary mail.

s/Marcia Beauchemin
Deputy Clerk